# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | No. 3:11cr23-1 |
| --- | --- | --- |
| | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| KAREEM SHABAZZ, | : | |
| Defendant | : | |

## MEMORANDUM

Before the court for disposition is Defendant Kareem Shabazz's motion to suppress. The court held a suppression hearing on October 24, 2011, and the parties have briefed their respective positions. After the completion of the transcript of the hearing, the parties filed supplemental briefs. The matter is thus ripe for disposition.

**Background**

On October 30, 2010, three individuals entered and robbed the M & T Bank in Hanover Township, Pennsylvania. The robbers escaped without being caught. The Federal Bureau of Investigation ("FBI") investigated the bank robbery. At the suppression hearing on this matter FBI Special Agent Larry Whitehead testified regarding the investigation. (Doc. 67, Transcript of Suppression Hearing, October 24, 2011 (hereinafter "Tr.")).[1] A break in the case came on December 27, 2010, when an

---

[1] Whitehead served as a Pittsburgh Police Officer for eight years before joining the FBI in 2002. (Id. at 5). He graduated from the University of Pittsburgh and received training pertaining to search and seizure issues during his training at the FBI Academy in Quantico, Virginia. (Id. at 6). He has experience investigating bank robberies from his time at the Pittsburgh

individual contacted the Scranton FBI office and told FBI Special Agent McMillen that he had information regarding the robbery. (Id. at 9). This individual became a cooperating witness ("CW").

CW identified the bank robbers as "Shabazz" who was staying in Elmira, New York, "Kindo" who resided in Wilkes-Barre, Pennsylvania area with this girlfriend, the third robber "Shay." (Id. at 11-12). "Shay" also had a home in Allentown, Pennsylvania. (Id. at 12). CW indicated that he sought to talk to investigators because he was angry at Kindo for selling heroin to his (CW's) girlfriend. She died from an overdose of the drug in November 2010. (Id. at 12).

CW indicated that he performed favors for Kindo to pay off drug debts incurred by his girlfriend. (Id. at 16). On the day before the robbery he performed one of these favors, that is, he drove to New York City and picked up two black men and drove them to his house in Pennsylvania. He knew one of the men as Shabazz and did not know the other male, who was later identified as James Russell. The men indicated that they were gangsters. (Id. at 17). While in New York on that day, CW also met with Kindo who drove back to Pennsylvania in a black Ford Explorer. (Id. at 16-17).

They arrived in Wilkes-Barre at CW's house at 10 or 11 p.m. (Id. at 17). Shabazz and Russell stayed at CW's home that night, which was the night before the robbery. They brought duffle bags into the house that they had loaded into the car in New York. (Id. at 11). The duffle bags contained a 9mm handgun and a sawed-off shotgun. (Id. at 12). At 4:30 or 5 a.m. the next day, the group left CW's home and drove to Kindo's

---

Police Department and his time with the FBI. (Id. at 6-7).

residence. (Id. at 13). Shay was evidently already at the house with Kindo. While at the residence, CW saw a sawed-off shotgun and two automatic handguns. Shay had another gun which she planned to use during the robbery. (Id. at 18). They discussed robbing the bank.

CW drove Shabazz, Russell and Shay to the bank in his red Chevrolet Cavalier. They waited across the street from the bank for Kindo -who was evidently located somewhere nearby- to give the signal to commence the robbery. (Id. at 19). Once Kindo gave the signal, CW drove into the bank parking lot and dropped off Shabazz, Shay and Russell. (Id.) CW indicated that Shabazz wore a mask, Shay wore a mask and black hooded sweatshirt, and Russell wore all white clothes during the robbery. (Id. at 13).

After dropping the others off to rob the bank, CW drove to the alley behind the bank to await them. (Id. at 19) When CW arrived behind the bank, he left the car to urinate in the alley. While he was still urinating, the three robbers ran down the alley toward the car. (Id. at 19). They entered the car, each holding their own bag of money that had been robbed from the bank. (Id.) The CW re-entered the car and drove them approximately a block to where Kindo waited in his black Ford Explorer. Shay exited the car and entered Kindo's vehicle. Shabazz and Russell told CW to drive them to New York. (Id.)[2]

Shabazz requested that CW not to take any toll roads while driving

---

[2] The CW's initial story to the FBI differed somewhat. He did not admit to driving the getaway car, but indicated that he had merely followed the robbers on the day in question as he suspected something illegal was going to happen. He stated he watched the robbery from across the street and that Kindo drove the getaway car. (Tr. at 13).

3

them to New York as cameras would record their faces inside the car. (Id. at 19-20). Along the way, CW had to stop for gas, and Shabazz told him that a bank robber should have a full tank of gas. Ultimately, he drove the men to Queens, New York, where they met Kindo and Shay at a local motel. CW drove back to Pennsylvania, evidently alone, after have been provided $100.00 for gas. (Id. at 20).

The FBI obtained CW's report on the matter through several meetings, both over the telephone and in person. CW's version of the manner in which the bank robbery occurred corresponded to evidence that the FBI had already gathered. Including some information that had never been made public. (Id. at 21-22).

The FBI thus enlisted further cooperation from CW in the form of recorded conversations with individuals who had been involved in the robbery. (Id. at 22). On December 28, 2010, CW placed two telephone calls to Shabazz which the FBI recorded. (Id. at 25-37). In the first conversation, the person who answered telephone acknowledged CW's greeting of "Shabazz." (Id. at 25). They engaged in a conversation which referenced the bank robbery, the division of the proceeds from the robbery and a prediction by one of the robbers that they would rob $200,000 from the bank. (Id. at 29).

Eight hours later, the FBI recorded another telephone conversation between Shabazz and CW. (Id. at 34). They discussed a planned home invasion robbery. (Id. at 35). CW was to pick Shabazz up at his residence in New York state and drive him to Pennsylvania to perpetrate the crime. CW asked Shabazz if he would be bringing the "ratchets" which is a euphemism for guns. (Id. at 34). Shabazz indicated that "[w]e got

everything on this end." (Id.) Special Agent Whitehead understood this answer to mean that weapons and firearms would be transported in CW's vehicle as it brought Shabazz from Elmira, New York to Pennsylvania. (Id. at 40-41).

Next, on December 29, 2010, the FBI recorded a telephone call between CW and Shaelyn Joy Davis. They made statements about the bank robbery and the division of the proceeds of the robbery. (Id. at 64).

Based upon all of this information, Special Agent Whitehead developed a plan to arrest Shabazz for bank robbery as CW drove him from Elmira, New York to Pennsylvania on December 30, 2010. (Id. at 43). To effectuate a safe arrest, the FBI coordinated with the FBI air surveillance unit, state police helicopters and ground surveillance units from the FBI and the state police. (Id. at 43-44). On the day of the arrest, the investigators outfitted CW with a body recorder, and air and ground surveillance vehicles followed his car. (Id. at 47 - 48). Agents searched both CW and his car before he left to pick up Shabazz. They found no contraband on CW or in his car. (Id. at 47). They told CW to do his best to have Shabazz place any items or bags he had in the trunk of the car with the excuse that he, CW, was a convicted felon and he did not want to get pulled over with any firearms in the car. (Id. at 51).

When CW arrived at the location where he was to pick up Shabazz, air surveillance watched an individual with a dark jacket and blue jeans place bags in the trunk of CW's car. (Id. at 49). Then the individual got in the front passenger seat of the vehicle. (Id.) CW then began the trip back to Pennsylvania. Before he left for Elmira, the FBI had indicated to CW that they would at some point stop his car by having a state police vehicle

pull up behind him and activate his lights.  (Id. at 50).  He was told to immediately pull his car to the right shoulder of the highway as in any routine traffic stop.  (Id.)  He was told to turn off his vehicle and remove the keys from the ignition.  (Id.)

The stop occurred in the southbound lane of Interstate Highway 81 near the Clarks Summit, Pennsylvania exit.  (Id. at 52).  The stop and arrest went as planned.  Shabazz left from the passenger side of the vehicle and the authorities arrested him.  (Id. at 55).  Incidently, at the same time as Shabazz's arrest, authorities executed a search warrant in Hanover Township, Pennsylvania and arrested Shaelyn Davis.  (Id. at 56).

Special Agent Whitehead believed evidence would be located in the vehicle, namely firearms.  (Id.)  The officers opened the trunk and found two bags.  One was a bluish-green floral suitcase and the other was a blue bag, with no closure on it, a "kind of stuffed sack."  (Id. at 57).  These bags were not in the trunk when agents searched it earlier in the morning.  (Id. at 57-58).  The presence of the bags was consistent with air support personnel's report that an individual placed two bags in the trunk when it was in Elmira, New York.  (Id. at 58).  In the bags the FBI found guns, ammunition and other instrumentalities of crime.

On January 25, 2011, the government filed an indictment against defendant charging him with Bank Robbery, 18 U.S.C. § 2113(d) and 2; Using a Firearm in Furtherance of a Crime of Violence, 18 U.S.C. § 924(c)) and 2; and Possession of Firearm by a Person Convicted of a Crime Punishable by Imprisonment Exceeding One Year, 18 U.S.C. § 922(g)(1) and § 924(e).

Defendant now seeks to suppress the following evidence found in the

search of the car: a black duffle bag, a short barreled shotgun, shotgun shells, two handguns, a clip with bullets, a ski mask, a painter suit, gloves and "other items." (Doc. 57, Mot. To Suppress, ¶ 9). He contends that the search and seizure were unreasonable and unconstitutional. Further, defendant argues that all physical evidence and observations of law enforcement officers on the date in questions were "fruit" of the unconstitutional search and seizure and must be suppressed.

**Standard of review**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." Skinner v. Rwy. Labor Exec. Ass'n, 489 U.S. 602, 613-14 (1989). By its own terms, the Fourth Amendment prohibits "unreasonable" searches and seizures. Whether a search and seizure is reasonable, "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985).

Generally a search is considered reasonable if it is performed pursuant to a valid warrant. Maryland v. Dyson, 527 U.S. 465, 467 (1999). Exceptions to this warrant requirement exist. Id. In the instant case, the investigating officers did not have a warrant for the search. Therefore, our task is to determine whether an exception to the warrant requirement is applicable.

**Discussion**

In the instant case, the government initially argues that defendant lacks standing to challenge the search and seizure at issue. The government further argues that even if the defendant had standing, the search and seizure were constitutional. We will address these issues separately.

**A. Standing**

Before addressing the merits of defendant's motion, the government contests defendant's standing to bring the motion. A defendant challenging a search and seizure based upon the Constitution's Fourth Amendment bears the burden of establishing that the government violated his rights. Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978).

In order to establish a violation of his rights, the defendant must first establish standing, or in other words, that he had a reasonable expectation of privacy in the place searched and the evidence seized. The Third Circuit Court of Appeals has described the defendant's burden as follows:

> To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure. These rights are violated only if the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. Significantly, a defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights. Because Fourth Amendment rights are "personal," the proponent of a motion to suppress bears the burden of proving not only that the search was illegal, but also that he had a legitimate

> expectation of privacy in the place searched. The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated.

United States v. Stearn, 597 F.3d 540, 551 (3d Cir. 2010).

In the instant case, the government asserts that the defendant has no standing to challenge the search. We agree.

It is uncontested that defendant rode as a passenger in a vehicle that he did not own and that CW drove. Thus, this case is similar to the United States Supreme Court case Rakas, supra. In Rakas, the defendants were passengers in a car that the police stopped on the suspicion that it may have been used in relation to an armed robbery. Rakas, 439 U.S. at 130. After stopping the vehicle, the police searched it and discovered a rifle under the seat of the car and ammunition in the glove compartment. Id. They then arrested the defendants. Id.

The defendants asserted that the search of the car violated the Fourth Amendment and moved to suppress the items found in the automobile. Id. The United States Supreme Court held, however, that the passengers did not have standing to challenge the search and seizure. The Court explained: "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Id. at 134. Central to the Court's holding is that in order to challenge a search and seizure, a defendant must have an interest in both the place searched and the property seized. In other words, it is not sufficient to state merely that one is a passenger in

9

a car to establish standing to challenge a search. The defendant must establish that he had a legitimate expectation of privacy in the areas of the car searched. Id. at 149 n.17. In Rakas the defendants "asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized." Id. at 148.

Similarly, in the instant case, defendant does not properly claim a legitimate expectation of privacy in the trunk of the car in which he rode as a passenger. An automobile trunk is an area "in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." Id.

Defendant asserts that his expectation of privacy in the bags which were located in the trunk is established by the testimony offered by the government that "appears to have connected those bags to" the defendant. (Doc. 69, Def. Suppl. Br. at 5). This "apparent connection" of the bags and their contents to the defendant established by the government's evidence is insufficient to meet the defendant's burden of establishing a privacy interest. Defendant presented no evidence at the suppression hearing that the bags and their contents were in fact his or that he had any possessory or privacy interest in them.[3]

Defendant further argues that as a passenger of the automobile he has standing to challenge its seizure. For this proposition he cites United States v. Mosely, 454 F.3d 249 (3d Cir. 2006). We find that although Mosely does stand for the proposition for which defendant cites it, this

---

[3] In fact such testimony may have been inconsistent with defendant's plea of not guilty to the charge of possessing the firearms. (Doc. 29, Not Guilty Plea).

holding does not advance the defendant's motion.  Mosely "is not an 'auto search' case." Id. at 253.  Rather, Mosely dealt with whether the defendant in that case, a passenger in the car, was illegally *seized* thus rendering unconstitutional any search done pursuant to the illegal seizure. Id.  Any "fruits" of a search conducted after an illegal seizure would not be admissible. However, Mosely explained:  "Passengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." Id. at 252-53.[4]   In the instant case, defendant argues that authorities did not have probable cause to establish that he had committed a crime at the time that they stopped the automobile.  As explained more fully below, we disagree.[5]

---

[4]Mosely explained that the seizure in that case involved the police pulling the car over.  Such action by the police constitutes a seizure of everyone in the car, and passengers in an illegally stopped vehicle have standing to object to the stop and the evidentiary fruits of the illegal seizure.  Mosely, 454 F.3d at 253.  To the extent that defendant argues that the car was illegally stopped in the instant case, we find that it was not.  As discussed more fully below, the police had probable cause to arrest the defendant before stopping the vehicle.  Therefore, Mosely is inapplicable as the search in the instant case did not uncover evidence that can be deemed "fruits" of an illegal seizure.

[5]The analysis of issues regarding standing and the substantive Fourth Amendment issues are related.  Rakas explains: "[W]e think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but intertwined concept of standing." 439 U.S. at 139.  Accordingly, we find it more appropriate to discuss probable cause below with regard to the substantive Fourth Amendment arguments instead of here with regard to standing.  By way of explanation, defendant cites Wyoming v. Houghton, 526 U.S. 295 (1999) for the proposition that a passenger has standing to challenge the search of bags stored by that

Because he cannot establish that the seizure of the car was

---

passenger inside of a vehicle.  In <u>Houghton</u>, police lawfully stopped a vehicle for speeding and driving with a faulty brake light.  <u>Id.</u> at 297.   The driver of the vehicle had a syringe visible in his shirt pocket.  <u>Id.</u> at 298.  The police asked him the reason for the syringe, and he said that he used it to take drugs.  <u>Id.</u>  The police then ordered the passengers out of the car and searched it for contraband.  <u>Id.</u>  It was uncontested that the officers had probable cause to search the car for illegal drugs.  <u>Id.</u> at 300.  One of the passengers left her purse on the back seat, and in it the police found drug paraphernalia and methamphetamine.  <u>Id.</u>  at 298.  The issue in the case was whether police officers violated the Fourth Amendment when they search a passenger's personal belongings inside an automobile that they have probable cause to believe contains contraband.  The court found no Fourth Amendment violation.  It held the passenger's belongings located in the car could be searched as long as the authorities possessed probable cause to search the vehicle.  <u>Id.</u>  at 307.

     Defendant cites to this case for the proposition that he has standing to challenge the instant search.   Although standing was not discussed in the Court's opinion, the passenger in that case was in a similar position to the defendant's position in this case, that is she was a passenger in a stopped car who had personal effects in the car searched by the police.  Defendant argues that because the Court did not deny that case on the basis of standing, this court should not deny his motion on standing.  As noted above, however, the <u>Houghton</u> opinion does not even discuss standing.  The Supreme Court has described the difficulty in separating the analysis of standing from the substantive Fourth Amendment analysis.  <u>See</u>, <u>Rakas</u>, <u>supra</u>.  Thus, except in somewhat clear cases, treating standing separately from the substantive issues of the case is not necessary.  For instance, <u>Houghton</u> case can be viewed as holding either: 1) the defendant in that case had no reasonable expectation of privacy in the purse left in the car, thus she had no standing to challenge the search or 2) the defendant had no expectation of privacy, therefore, no Fourth Amendment violation occurred.  But whether a finding of probable cause means a defendant has no standing or that the police did not violate defendant's rights is of little bearing in a case such as this where probable cause on the part of the police answers both questions.

unconstitutional, defendant cannot successfully argue that evidence found in the automobile is the "fruit" of an unconstitutional seizure.

Accordingly, we find that the defendant lacks standing to challenge the instant search. If we did find standing, however, we would nonetheless deny the motion for a number of reasons that we discuss separately below.

**B. Consent**

First, the search and seizure are constitutionally sound because CW consented to them. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (explaining that consent is an exception to the warrant requirement). Consent may be express or implied, but it must be voluntary. Id. at 235; United States v. Lockett, 406 F.3d 207, 212 (3d Cir. 2005).

Here little question exists but that the CW voluntarily consented to the search and seizure of the automobile. He voluntarily approached the FBI with the information that he had regarding the bank robbery. He agreed to allow the FBI to record telephone calls he had with the defendant. He agreed to wear a body wire when proceeding to pick the defendant up on December 30, 2010 and to have the police stop the vehicle on the way back to make the arrest. He permitted the authorities to search the car before the trip to ensure that no contraband was located inside, and he agreed to instruct the defendant to place the evidence in the trunk. He also agreed to the procedure for stopping the vehicle. This witness cooperated with authorities and no evidence exists that he did not consent or agree with the search of the vehicle.

Special Agent Whitehead testified as follows:

Q. [AUSA John C. Gurganus] In your opinion did you have the agreement from [CW] that the car could be searched?

A. [Special Agent Whitehead] Absolutely.

Q. What did you base that on?

A. His continuing cooperation and his consent.

Q. He was the owner of this car, right?

A. Yes, he is.

(Tr. at 59)

On cross-examination, he testified further:

Q. [Atty. Brandon R. Reish] The continuing cooperation of [CW] in this case gave you belief that you had consent to search the vehicle . . . ?

A. Yes, that is correct.

Q. You never asked him, specifically, to search his vehicle after this did you?

A. No, it was applied [sic] with phone calls, the body wire, we asked him for his permission to pull the fuse in his vehicle and everything. I mean, every request from us was agreeable to him, and, obviously, it was his car, we were going to turn it back over to him after this operation.

(Tr. at 72).

Defendant's argument is that no evidence exists that consent to search the vehicle was given. Based upon the evidence as set forth above, we disagree and find that as a cooperating witness engaged in an operation to arrest the defendant, the CW consented to the search. Accordingly, the motion to suppress is properly denied.

**C. Search incident to an arrest**

Even if the authorities did not have consent to search the vehicle, the search was still proper as a search incident to a lawful arrest. Several scenarios make such a search reasonable, but the predicate of them all is

14

a lawful arrest. Initially, therefore, we must determine whether the authorities made a lawful arrest of the defendant. Defendant argues that the arrest in the instant case was not lawful. Therefore, the stop of the vehicle was improper.

Defendant admits that "the confidential witness's description of Shabazz's involvement in the bank robbery in combination with the recorded statements discussing the falling out between Shabazz and the other bank robbers after the bank robbery appears to establish probable cause for the arrest of Shabazz." (Doc. 69, Gov't Mem. at 6). Defendant argues, however, that the police did not know that the individual in the car with the confidential witness was in fact Shabazz. We find this argument unconvincing. Sufficient reason existed for the authorities to believe that the passenger in the car was Shabazz, the individual who the CW asserted took part in the bank robbery. CW spoke to the defendant on the phone about picking him up in Elmira, New York and driving him to the Wilkes-Barre, Pennsylvania area. CW was directed to have Shabazz place the instrumentalities of the crime in the trunk of the car. CW drove to Elmira and stopped at a residence. Someone from the residence placed something in CW's trunk and then got in the passenger side of the car. CW then drove this passenger into Pennsylvania toward the Wilkes-Barre area.

Defendant's argument is that when CW arrived in Elmira, "individuals' were observed exiting the house, and only one entered the vehicle with CW. Thus, the government agents could not know that the individual who entered the car was in fact Shabazz. This argument is not cogent. Based

15

on the evidence set forth above, the police had probable cause[6] to believe that the passenger that CW was transporting had taken part in the bank robbery.[7] Accordingly, defendant's arrest was lawful.

A warrantless automobile search incident to the lawful arrest of an occupant of that car is constitutional in several different situations. For example "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" police may "search a vehicle incident to a recent occupant's arrest." Arizona v. Gant, 556 U.S.

---

[6] "Probable cause" has been described by the United States Supreme Court as "a reasonable ground for belief of guilt." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks and citation omitted). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Id. (internal quotation marks and citation omitted).

[7] Defendant argues that the government could not make an individualized determination at the time of the arrest that the person arrested was in fact Defendant Shabazz. Defendant cites no authority that such a requirement is found in the law. The government had probable cause to arrest whoever the passenger was regardless of whether they could personally identify him as Shabazz or not. Additionally, defendant's argument is based at least partially on the fact that the record indicates that at sometime after CW arrived in Elmira, "individuals" were seen leaving the residence located there. Because more than one individual was at the house and only one got in the car, the government agents could not have been sure that the one to enter the car was Shabazz according to defendant. The standard for the arrest, however, is probable cause, not absolute certainty of the identity of the defendant. The evidence as set forth above provided probable cause. The testimony that defendant cites to is also ambiguous. It is not clear when the term "individuals" is used whether it means the CW and the defendant, or the defendant and someone else. (Tr. at 49).

16

332, 343 (2009). This situation, however, is not present in the instant case, because the defendant was handcuffed and in custody at the time of the search.

Additionally, a vehicle may be searched incident to a lawful arrest where it is "'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Id. (quoting Thornton v. United States, 541 U.S. 615, 632 (2004)). In our case then, if the FBI and police had a reasonable belief that evidence relevant to the crimes of arrest - bank robbery or using a firearm in furtherance of a crime of violence - might be found in the vehicle, then the vehicle could properly be searched. After a careful review, we conclude that it was reasonable to believe that the automobile would contain evidence of the bank robbery.

The robbery had occurred approximately two months before the date of the search. For that robbery, CW had traveled to New York City, NY and picked up the defendant to bring him to Pennsylvania. The defendant loaded guns into the car for the trip to Pennsylvania. Similarly in this instance, the CW had traveled to New York state to meet the defendant to drive him to Pennsylvania. The defendant had indicated during the recorded phone call that he would have the guns. It is reasonable for authorities to believe that these would be the same guns used in the robbery two months earlier. Also, for the robbery, masks and bags to carry the loot were used. It was reasonable to believe that such instrumentalities of the crime would be re-used for the home invasion/robbery that defendant intended to commit with CW. [8] Because the investigating

---

[8]The government also charged the defendant with Possession of Firearm by a Person Convicted of a Crime Punishable by Imprisonment

17

authorities had a reasonable belief that evidence relevant to the crime of arrest might be found in the vehicle, the search was reasonable.

Additionally, the search is reasonable under the third situation where an automobile properly may be searched incident to a lawful arrest without a warrant. This situation is where probable cause exists that the vehicle contains evidence of criminal activity. This criminal activity, however, does not have to be the same criminal activity for which the defendant is ultimately arrested. "If there is probable cause to believe a vehicle contains evidence of criminal activity" police may search "any area of the vehicle in which the evidence might be found." Gant, 556 U.S. at 347 (citing United States v. Ross, 456 U.S. 798, 820-821 (1982)). "Ross allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." Id. In the instant case, police had probable cause to believe that the vehicle contained evidence of criminal activity for which defendant was not arrested. As set forth above, the defendant was planning a home invasion/robbery with CW and indicated that he would have everything in order to carry out the invasion, including the guns. The authorities witnessed the defendant placing bags in the car. They therefore had probable cause to believe that these bags contained instrumentalities of the crime such as guns. This probable cause renders reasonable the search of any area of the vehicle

---

Exceeding One Year, 18 U.S.C. § 922(g)(1) and § 924(e). It was arguably reasonable for the FBI to believe that evidence of this crime would be found in the car. They knew that the defendant had claimed to the CW that he had been in jail for a very long time. They believed that firearms were located in the trunk of the car. These firearms would be evidence of a violation of the possession of a firearm by a felon charge.

that could have contained evidence of the crime.   Accordingly, the defendant's motion to suppress will be denied.

**Conclusion**

In conclusion, we find that defendant does not have standing to challenge the search at issue as he does not assert a valid possessory interest in either the vehicle searched or the objects seized.   Regardless, he does have standing to challenge the seizure at issue as lacking probable cause.  However, probable cause did exist for the based upon the evidence provided by CW to the government agents.

Moreover, regardless of standing, the CW consented to the search of the car.  The government also had a reasonable belief that the automobile would contain evidence of the crime charged and probable cause to believe that the vehicle contained objects of criminality related to other crimes.  Thus, the search was not unreasonable under the Fourth Amendment to the United States Constitution and the motion to suppress will be denied.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:11cr23-1 |
| | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| KAREEM SHABAZZ, | : | |
| Defendant | : | |

## ORDER

**AND NOW**, to wit, this 14th day of February 2012, the defendant's motion to suppress (Doc. 57) is hereby **DENIED**.

                                    **BY THE COURT:**

                                    **s/ James M. Munley**

                                    **JUDGE JAMES M. MUNLEY**
                                    **United States District Court**